UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | Case No. 4:05-CR-23 |
| v. | ) | Collier/Lee |
| | ) | |
| JOE MICHAEL BORNE | ) | |

REPORT AND RECOMMENDATION

I. Introduction

Defendant Joe Michael Borne ("Borne") has filed a motion, as supplemented, to suppress evidence and statements obtained during a search of his person and the vehicle he drove during the evening of March 31, 2005 [Doc. Nos. 14, 20]. The motion has been referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Borne contends law enforcement officers conducted an illegal stop, search of his person, and search of the trunk of the vehicle he was driving. For the reasons stated herein, it is **RECOMMENDED** that Borne's motion be **DENIED**.

II. Relevant Facts

The court held an evidentiary hearing on Borne's motion to suppress on August 19, 2005. During the hearing, the government offered the testimony of Tennessee Highway Patrol Troopers Tim Garner ("Garner") and Brandon Hunt ("Hunt"). Borne testified and also called as witnesses his sister, Mary Campbell ("Campbell"), and Deputy James Caldwell ("Caldwell") of the Grundy County Sheriff's Department. On August 29, 2005, Borne also submitted a post-hearing memorandum in support of his motion to suppress [Doc. No. 30]. On September 1, 2005 the government filed its response to defendant's post-hearing memorandum [Doc. No. 32].

*Trooper Tim Garner's Testimony*

Garner testified that he is a trooper with the Tennessee Highway Patrol and has been employed in law enforcement for about 12 years. Prior to becoming a trooper, Garner worked in commercial vehicle enforcement. Garner has experience and training in the areas of traffic patrol and narcotics. His experience includes involvement with illegal methamphetamine laboratory cases, and he is familiar with the odors associated with the manufacture of methamphetamine.

On March 31, 2005 around 10:00 p.m., Garner was parked on the side of Highway 108 in his marked patrol car. Garner was parked next to the patrol car of Hunt as they sat in their cars talking. A maroon Chevy Lumina passed the officers in the right hand lane about 25 feet from Garner traveling in the direction Garner's patrol car was facing. Garner did not know who was driving the car, but he noticed that the muffler was making a loud rattling sound that was louder than a normal muffler. Garner decided to stop the vehicle for a muffler law violation. Garner is not aware of any device that measures the sound of a muffler to determine if it is too loud. Garner has made several muffler law violation stops in the last few years.

Garner pulled into the roadway and followed the car with his blue lights activated for a short distance. In response, the car pulled over to the side of the road. Garner exited his patrol car and approached the stopped vehicle. Upon seeing the driver, he immediately recognized Borne, whom Garner has known for many years. Garner explained that both he and Borne live in small communities near each other (Coalmont and Gruetli-Laager) where most people know each other. Until Garner saw Borne in the stopped vehicle, however, Garner did not know that Borne was driving the vehicle. Garner also did not know the type of vehicle being driven by Borne until the stop.

Garner approached the vehicle and Borne spoke to him through the Lumina's window.

Garner thinks, but cannot be certain, that he told Borne he was stopped for a muffler law violation. Garner asked for Borne's license, registration, and proof of insurance, and Borne provided the requested documentation.

Garner was aware that Borne had been arrested and convicted in the past for methamphetamine-related offenses, and the parties stipulated for purposes of the suppression hearing that Borne's past criminal history is accurately reflected in the pretrial services report. Garner did not know if Borne was high at the time of the stop, but he noticed Borne appeared nervous. On cross examination, Garner stated that Borne did not have slurred speech or exhibit other signs he was high on methamphetamine at the time of the stop.

Borne opened the window to speak to Garner, and Garner immediately noticed a strong chemical odor that smelled like methamphetamine. Garner stated that in the past the smell of methamphetamine had given him a headache and that the chemical smell from Borne's car gave Garner a similar headache. Although Garner agreed that it is important to note the presence of odors in reports concerning incidents and arrests, he did not mention odor in his written report, which was made an exhibit. Likewise, odors are not mentioned in the National Clandestine Laboratory Seizure Report prepared by a non-witness, which report was also made an exhibit to the hearing.

Garner next asked Borne if he had any alcohol, narcotics, or weapons in the car, and Borne said no. Based on his knowledge of Borne's criminal history, Garner did not believe Borne. As a result, Garner then asked Borne to exit the car and also asked Borne to consent to a pat-down search of his person, and Borne agreed. During the pat-down of Borne, Garner felt a small item with a knot in Borne's watch pocket that Garner believed was a package of illegal drugs. Garner pulled the package out and it appeared to be a package of methamphetamine. On cross examination, Garner

3

agreed the package was similar in size to a piece of candy and that he knew it was not a weapon when he felt it during the pat-down.

Based on his experience and training, Garner believes that people who use methamphetamine are dangerous, unpredictable, and often armed with firearms. Garner stated he was not fearful of Borne, but he was fearful of what someone under the influence of methamphetamine could do, and that he was uncertain what Borne might do. Garner said that he weighs about 225 pounds to Borne's 175 pounds.

After Garner found the suspected methamphetamine, he arrested Borne and informed him of his *Miranda* rights. Garner's testimony was not entirely clear on the sequence of events, but he apparently placed handcuffs on Borne at the time of his arrest. Although he could not be certain, Garner believes that Hunt arrived at the scene of the arrest about this time.

Garner removed the handcuffs that he had placed on Borne and directed him to move his car out of the roadway to a nearby parking lot. Garner told Borne that he was videotaping his movements from a video camera in the patrol car so Borne should not "try anything." In reality, the video camera in Garner's patrol car did not work.

After Borne moved his car, Garner asked for permission to search the vehicle, and Borne hesitantly agreed. Hunt performed the search, and at some point prior to or during the search, Borne stated the materials in the trunk were not his. Garner noticed the chemical odor was stronger in the trunk. In the trunk, Hunt found a small black bag containing a handgun, suspected methamphetamine, red phosphorus, glass flasks, filters, tape, and other items. Based on his experience and training, Garner believes these materials are used in the manufacture of methamphetamine.

Garner does not recall if he gave Borne any type of citation for his violation of the muffler law. At some point, Hunt made a recording of the encounter with Borne using the equipment in Hunt's patrol car, but neither party introduced the video/audio recording into evidence. Garner is not aware of any recording that includes the sound of the noise made by the muffler on Borne's car.

*Trooper Brandon Hunt's Testimony*

Hunt has been a trooper with the Tennessee Highway Patrol for about two years. He was pulled alongside of Garner when the Lumina drove past the two parked patrol cars. Garner told Hunt that he was going to pull the vehicle over, but did not state why. Garner did not mention who was driving the vehicle, drugs, or the muffler. Hunt heard the muffler and thought it sounded loose and louder than a normal muffler. Hunt has made about 15 muffler law violation stops in the past year, but did not pursue the vehicle.

Sometime later, perhaps after three to five minutes lapsed, Hunt joined Garner. When Hunt arrived at the stop, Borne was out of the vehicle, which had been moved to the parking lot, and Borne was already under arrest. Hunt did not see the search of Borne's person.

Hunt conducted the search of the car. He opened and searched the trunk first, then searched the bag in the trunk, and then searched the interior of the car. Based on photographs entered into evidence and testimony, the bag located in the trunk contained a gun, suspected methamphetamine and methamphetamine manufacturing materials. Hunt noticed the chemical smell, which he described as a strong odor like ammonia or iodine, and said the odor was strongest in the trunk and in the backseat of the vehicle. Hunt did not notice the chemical smell until after he opened the trunk, but he noticed the smell before he opened the bag in the trunk.

*Deputy James Caldwell's Testimony*

5

Caldwell is a deputy with the Grundy County Sheriff's Department and has been in law enforcement for several years. He also lives in the same small community as Borne and has known Borne for about six years. He knows that Borne has a history of criminal involvement with methamphetamine.

In the weeks prior to March 31, 2005, Caldwell stopped Borne twice in the same Lumina he was driving at the time of his arrest. The approximate dates of the stops were the last week in February and the first week in March. At neither time did Caldwell notice a muffler law violation or loud sound. Caldwell has never stopped a car for a muffler law violation.

On the night of March 31, 2005, Caldwell noticed and stopped by the scene of Borne's arrest. Borne was already in the back of a patrol car, and the troopers were conducting an inventory of items found in Borne's car. Caldwell saw the black bag and handgun as well as a few items removed from the bag. He was approximately two to three feet from the car. Caldwell detected no chemical odors. Borne's car was not turned on, and Caldwell never heard the car running on the night of March 31.

*Mary Campbell's Testimony*

Campbell is the sister of Borne. She lives next door to Borne, and sees him on a daily basis. On both the day before and the morning of Borne's arrest, she heard his car drive by on the gravel driveway that is located very close to her window, and heard nothing unusual or loud about the muffler. She has past personal experience with a muffler problem and does not believe that Borne's car sounded like it had any muffler problems around 10:00 a.m. on March 31, 2005, which is when she last heard Borne's car drive by her house.

*Joe Michael Borne's Testimony*

Borne lives near his sister and other family members in Gruetli-Laager. He has a ninth grade education and no mental health problems. On March 31, 2005, he was driving his Lumina and pulled his car off the roadway when he saw the blue lights of the patrol car behind him. Garner requested Borne's driver's license, registration and insurance papers and Borne provided the requested documentation. Garner also asked Borne for consent to search the car and Borne said no. Borne's testimony about the sequence of events was not entirely clear, but it appears that Garner also asked Borne if he had any weapons or drugs in the vehicle and Borne responded no. At the time he responded, Borne knew that he had a handgun in the car and that as a convicted felon it was unlawful for him to have a gun. Garner also asked Borne to step out of the car and empty his pockets. Borne complied with this request. After Borne stepped out of the vehicle, Garner, without first conducting a pat-down, reached into Borne's watch pocket and pulled out a small knotted package of methamphetamine. Although some of Borne's responses mentioned or indicated a pat-down, when asked directly, Borne denied that Garner either asked for permission to reach into Borne's pocket or conducted a pat-down of Borne prior to reaching into Borne's watch pocket. After the methamphetamine was located in his pocket, Borne was placed under arrest and handcuffed.

After the arrest, Garner uncuffed Borne and told Borne to move his car out of the roadway, and Borne did so. At the time of the stop, Borne knew he had methamphetamine in his pocket, but did not know he had methamphetamine or methamphetamine manufacturing supplies located in the trunk of his car. He last saw the methamphetamine manufacturing supplies a day or so prior to the stop somewhere other than his trunk. He admitted certain methamphetamine manufacturing

materials were wet when he last saw them and said such materials can remain wet for a day or so. Borne admits the methamphetamine manufacturing supplies in the trunk are his; but he does not know how they got into the trunk of his Lumina. Borne said he never told Garner that the methamphetamine manufacturing supplies in the trunk were not his.

Borne is familiar with the smell of methamphetamine and odors created during the manufacture of methamphetamine. Borne denies that such odors emanated from his car at the time of his arrest. In other direct contradictions to Garner's testimony, Borne said he was not informed of his *Miranda* rights, did not give consent for his vehicle to be searched, and did not state that the items in his trunk were not his.

On at least two occasions prior to March 31, 2005, Borne was stopped by law enforcement in the Lumina, which he purchased from a girlfriend. In neither earlier stop did the law enforcement officers mention any problem associated with the car's muffler. Borne was stopped by Hunt on at least one prior occasion, on or about March 1, 2005, for speeding while driving the Lumina.

### III. Analysis

*Credibility*

Much of the determination of this motion turns on the credibility of the witnesses. The credibility determinations are particularly important to the issues of whether Borne's muffler was making a loud noise, whether an odor associated with methamphetamine emanated from the car, and whether Borne gave consent to search the vehicle. I find the testimony of the officers to be far more consistent, plausible and credible than the testimony of Borne. Borne's testimony was not always internally consistent and he has every motivation to fabricate testimony. Borne questions Garner's facial expressions and the manner of Garner's testimony, which Borne called "halting and without

8

elaboration" [Doc. No. 30, at 2]. I, however, found Garner's testimony credible and supported by the testimony of Hunt.

The testimony of witnesses Campbell and Caldwell is of limited import to the credibility issues. Regarding the question of whether the muffler was loud or rattling at the time of the stop, both Caldwell and Campbell gave testimony only about the condition of the muffler at times earlier in the month and day respectively, and neither heard the muffler at the time of the stop. Likewise, Caldwell's testimony that from several feet away he could not smell a chemical odor after items were removed from the trunk and were being inventoried does not establish that Hunt and Garner fabricated their ability to smell the chemical odor under other circumstances. I find the testimony establishes that the strength and existence of the odor varied based on timing of exposure, sensitivity to odors, and proximity, not that Garner was fabricating that he smelled a chemical odor when he spoke to Borne through the car window.

*The Vehicle Stop*

Borne argues that Garner did not have probable cause to stop his vehicle for a muffler law violation because there was nothing wrong with his muffler. The government contends a muffler law violation occurred, so Garner had probable cause to stop the vehicle for a traffic violation. Credible evidence was presented that Borne's muffler was not louder than average in the weeks before, days before, and arguably even the morning of his arrest. The testimony of Hunt and Garner, however, is that on the night of March 31 the muffler was loud and rattling when the vehicle drove past the troopers. The only evidence contradicting the troopers' testimony about the sound of Borne's muffler on the night of March 31, is the testimony of Borne. To find in Borne's favor on the issue of the muffler, it would be necessary for me to conclude that both Hunt and Garner's

testimony about the muffler is not credible. As stated above, however, I conclude the testimony of the troopers that the muffler was loud or loose to be consistent, plausible, and credible. The lack of a recording of the muffler noise also does not indicate fabrication by the troopers since Garner's recording equipment was not functioning, and that the car was not running while Hunt's operable audio equipment was at the scene of the search.

It is well established that the police may lawfully detain a vehicle where there is probable cause to believe a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 810 (1996) ("the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); *United States v. Freeman*, 209 F.3d 464, 465 (6th Cir. 2000); *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996), *cert. denied*, 520 U.S. 1178 (1997). The police may lawfully detain a vehicle and conduct a brief stop of its occupants where there is probable cause to believe a traffic violation has occurred, even if the traffic offense is minor and the officer had additional subjective reasons for making the stop. *Whren,* 517 U.S. at 810, 813; *United States v. Herbin*, 343 F.3d 807, 809 (6th Cir. 2003). A traffic stop is subject to a constitutional requirement that it not be "unreasonable" under the totality of the circumstances. *Id.* at 810, 812-13. Thus, in determining whether an automobile stop based on probable cause to believe a traffic violation has occurred is constitutional, the court must conduct a fact specific inquiry that turns upon whether probable cause existed to justify the traffic stop based upon the totality of the circumstances. Although the proponent of a motion to suppress generally bears the burden of demonstrating his or her Fourth Amendment rights were violated by a challenged seizure or search, *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978), it is the government's burden to demonstrate a particular seizure was based on probable cause. *United States v. Baldwin*, No. 03-4139, 2004 WL

10

2591245, at *6 (6th Cir. Nov. 12, 2004).

I conclude that the government has established that Garner had probable cause to stop the vehicle on the basis of a muffler law violation. Tennessee Code Annotated § 55-9-202 states in pertinent part:

> (a) No person shall drive a motor vehicle on any road, street or highway unless such motor vehicle is equipped with a muffler in good working order and in constant operation to prevent excessive or unusual noise and annoying smoke . . .
>
> (c) A violation of the section is a class C misdemeanor.

In *Blye v. State*, 2000 WL 682638 (Tenn. Crim. App. May 26, 2000), Blye was convicted of evading arrest and possessing more than .5 grams of cocaine with intent to sell. *Id.* at *1. The events leading to Blye's arrest and conviction began on July 8, 1994, when an officer of the Kingsport Police Department spotted Blye driving a black Chevrolet Cavalier being driven with its stereo blaring loudly. The officer activated his blue lights and stopped the car with the intention of informing Blye that he was violating a noise ordinance. Upon being stopped, Blye immediately exited his car. The officer told Blye to get back into his car, but Blye fled the scene with the officer in pursuit. Other officers soon joined the pursuit, one of whom observed Blye drop a clear plastic bag containing a substance that was eventually determined to be cocaine. *Id.* Blye filed a petition for post-conviction relief asserting that his trial counsel was ineffective for, *inter alia*, failing to challenge the validity of the stop of his vehicle. *Id.* at *2. In finding that the stop of Blye's vehicle was valid, and therefore his trial counsel was not ineffective for failing to challenge the stop, the Blye court stated:

> In *State v. Stephen C. Cloyd,* Washington County (Tenn. Crim. App., at Knoxville, March 21, 1985), this court upheld the stop of a vehicle where the basis of the stop was a violation of the State's muffler law

> found at Tennessee Code Annotated section 55-9-202a. Subsequent to the stop, the officer had reason to believe the driver was intoxicated and ultimately arrested him for driving under the influence. Likewise, in the case at bar . . . the . . . noise ordinance violation gave . . . a reasonable basis upon which to stop the vehicle . . .

*Id.* at * 5. In this case, a muffler law violation was a reasonable basis upon which to stop Borne's vehicle given the credible testimony.

Borne argues that the lack of a recording of the muffler noise by the officers at the time of his arrest supports his testimony that the muffler was not in violation of the muffler law. The fact that the muffler noise was not recorded on Hunt's patrol car recording system does not lead me to conclude the officers have fabricated their testimony since there was no reason for the car to be running during the time Hunt apparently was recording events. It is undisputed that Garner's equipment was not operable, and it appears reasonable that he told Borne the equipment was recording events when he allowed Borne to move his car after the arrest in order to deter any illegal action by Borne. I also find Borne's argument that Hunt's failure to participate in the initial traffic stop demonstrates there was no muffler law violation equally unavailing. Hunt's actions are just as likely to show that Hunt chose not to join what initially appeared to be a routine traffic stop after the officer parked facing the direction of Borne's travel indicated he was initiating the stop.

Borne appears to take the position that the muffler law violation was not the true motivation for Garner's stop, suggesting that Garner actually stopped the car solely because Garner knew it was driven by Borne. I find, however, that Garner's testimony that he did not know who was driving the vehicle when he decided to pull it over is credible. Garner's testimony is supported by the fact that Borne purchased the car from a girlfriend and that there was no testimony that Garner had ever come into contact with Borne while he was driving the Lumina. Even in very small communities it is

12

reasonable to believe that Garner does not know the owner/driver of every car on the roadway.

Even if Garner had another reason for stopping the vehicle, courts are directed to disregard an officer's subjective intentions and instead to determine whether the traffic stop itself was justified by probable cause. *See, e.g., Devenpeck v. Alford*, — U.S. —, 125 S. Ct. 588, 593-94 (2004); *Arkansas v. Sullivan*, 532 U.S. 769, 771-72 (2001) (reversing Arkansas Supreme Court's suppression of evidence because, despite existence of probable cause for arrest leading to evidence, lower court suppressed evidence based on officer's subjective motivation); *Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). The United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") recently upheld the validity of a so-called "pretextual" traffic stop, stating an officer may lawfully stop a vehicle based on a traffic violation even when his true motivation is to search for contraband if the officer had probable cause to initially stop the vehicle. *Herbin*, 343 F.3d at 809-10. Whether Garner was motivated to stop the car by a subjective desire to search the vehicle for contraband is not relevant to the existence of probable cause to support the traffic stop he initiated. As discussed above, Garner observed circumstances which establish probable cause to believe the vehicle violated Tennessee law regarding mufflers, thus justifying the traffic stop. Because a proper stop was conducted, any argument about possible ulterior motives for stopping the vehicle fails.

### *Reasonableness of Detention and Pat-Down of Borne*

Finding a valid traffic stop justified at its inception does not end the inquiry because any detention must be related in scope to the circumstances that justified the stop in the first place. *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996). While a police officer may stop a motorist whom he has probable cause to believe has committed a traffic violation, he cannot

13

continue to detain that motorist after the initial purpose of the stop is completed "unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 (2000); *accord Bradshaw*, 102 F.3d at 212.

When a vehicle is lawfully stopped, an officer may request a driver's license and vehicle registration from the driver. *See Berkemer v. McCarty*, 468 U.S. 420, 437-38 (1984); *Hill,* 195 F.3d at 269. The driver of a vehicle may be detained until after the officer has finished verifying the driver's license, checking other records, and issuing a citation, as these acts are within the purpose of the initial stop. *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999); *Bradshaw*, 102 F.3d at 212.

It is settled that when the purpose of a traffic stop has been accomplished, an officer cannot further detain a vehicle or its occupants unless facts occur that would generate reasonable suspicion to justify further detention. *Weaver v. Shadoan*, 340 F.3d 398, 408 (6th Cir. 2003); *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995). Reasonable suspicion must be supported by specific articulable facts. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998), *cert. denied*, 525 U.S. 1123 (1999). A court must look at the totality of the circumstances when determining whether the length and manner of an investigative stop are reasonable in comparison to the basis for the initial intrusion. Generally, if a detention exceeds its proper scope, then any evidence seized during the illegal detention must be suppressed as fruit of the poisonous tree. *Hill*, 195 F.3d at 264.

Borne suggests that Garner should not have asked if he had weapons or drugs in the car. In *United States v. Burton*, the issue before the Sixth Circuit was whether it was reasonable for an officer to ask someone detained during a traffic stop questions that were unrelated to the initial

14

reason for the traffic stop. 334 F.3d 514, 518-19 (6th Cir. 2003). In *Burton* an officer initiated a traffic stop due to a curbside parking violation, and he spoke with the driver outside the stopped vehicle regarding his driver's license, ownership of the vehicle, and whether anything illegal was inside. *Id.* at 515. The Sixth Circuit concluded the scope and duration of this traffic stop was reasonable because the handful of questions the officer asked the driver were not unusually intrusive and did not make the traffic stop any more coercive than a typical traffic stop. *Id.* at 518-19; *see also United States v. Alva*, No. 03-5175, 2004 WL 1661990, at *3-4 (6th Cir. July 20, 2004) (holding questions asked of vehicle occupants, including whether vehicle contained anything illegal and whether officer could search the car, did not violate the Fourth Amendment because questions were reasonable, on same basis as and in reliance on *Burton* decision) *cert. granted and judgment vacated on* Booker *sentencing grounds by* 125 S. Ct. 1041 (2005), *opinion reinstated as to conviction by* 405 F.3d 383 (6th Cir. 2005). I find Garner's questions did not violate Borne's Fourth Amendment rights.

Borne also suggests that Garner should not have asked him to exit the car pursuant to a muffler stop. An officer can lawfully ask a driver to exit his car, and even to sit in the officer's patrol car, while the officer completes routine traffic stop tasks. *Wellman*, 185 F.3d at 656 (officer lawfully asked defendant to sit in squad car while writing courtesy citation and performing record check of driver's license and registration); *Bradshaw*, 102 F.3d at 211-212 (explaining temporary detention of driver in patrol car for officer safety and while performing radio checks and issuing citation was well within bounds of initial stop). Therefore, Garner's request that Borne exit the car during the investigation was reasonable.

When an individual is subject to a lawful investigative detention, an officer may conduct a

15

limited frisk or pat-down of that person for weapons if the officer has a reasonable suspicion of criminal activity and a reasonable belief that the suspect is armed and dangerous. *See Terry v. Ohio,* 392 U.S. 1, 30 (1968); *United States v. Walker*, 181 F.3d 774, 778 (6th Cir.), *cert. denied*, 528 U.S. 980 (1999). "[T]he issue is whether a reasonably prudent person in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. In justifying the particular intrusion, the officer must be able to point to specific and articulable facts which, when taken together with rational inferences from those facts, reasonably warrant that intrusion. *Id.* at 21; *Walker*, 181 F.3d at 778. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence...." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)). "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Id.* Notwithstanding this last proscription, an officer may lawfully seize nonthreatening contraband concealed on the suspect's person where the police officer lawfully pats down a suspect's outer clothing for weapons and immediately recognizes the incriminating character of the contraband. *Dickerson*, 508 U.S. at 375. In so holding, the Supreme Court in *Dickerson* reasoned, "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour and mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." *Id.* at 375.

Officers who stop a person who is reasonably believed to be either carrying or dealing drugs "are 'entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions,' and to take reasonable measures to protect themselves." *United States v.*

16

*Jacob*, 377 F.3d 573, 579 (6th Cir. 2004), *cert. denied*, ___ U.S. ___, 125 S. Ct. 1358 (2005) (quoting *Heath*, 259 F. 3d 522, 530 (6th Cir. 2001). In the instant case, there are numerous specific and articulable facts which, when considered collectively, lead me to conclude that Garner could appropriately engage in a protective pat-down. As noted above, Garner knew that Borne had been arrested in the past for methamphetamine-related crimes, Garner detected the odor of methamphetamine during his initial contact with Borne, and Borne acted nervous. Thus, I find that Garner possessed a reasonable belief on the basis of specific and articulable factors that Borne might be armed and dangerous. On the basis of all of this information, Garner was justified in conducting a pat-down of Borne for concealed weapons without consent.

During the course of Borne's pat-down, Garner felt a package that he knew from experience investigating narcotics was likely to contain contraband, and the incriminating nature of the object was immediately apparent to Garner. At the point Garner perceived the incriminating nature of the package, he could lawfully seize the contraband without a warrant. *Dickerson,* 508 U.S. at 375-66*; Walker*, 181 F.3d at 779 (6th Cir. 1999). Borne was then lawfully arrested based upon the suspected methamphetamine found in his pocket.

*Search of Vehicle*

With respect to the warrantless search of the trunk, the government has argued the search does not violate Borne's Fourth Amendment rights because Borne gave consent to the search of his vehicle after his arrest. Borne flatly denies he gave consent. A warrantless search is "'*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions'" such as consent. *United States v. Hudson,* 405 F.3d 425, 440 (6th Cir. 2005) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). It is established that "'[a]n officer with

17

consent needs neither a warrant nor probable cause to conduct a constitutional search.'" *Hudson*, 405 F.3d at 440 (quoting *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996), *cert. denied*, 520 U.S. 1170 (1997)).

To justify a search based on an individual's consent to the search, the government has the burden to show by a preponderance of the evidence the consent was freely and voluntarily given and was not the result of coercion, duress, or submission to a claim of authority. *See Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968). Whether consent is voluntary is determined by considering the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). In *United States v. Crowder*, 62 F.3d 782, 787 (6th Cir. 1995), *cert. denied*, 516 U.S. 1057 (1996), the court listed a number of factors to consider in determining whether consent to search was given voluntarily, including: minimal schooling; low intelligence; lack of effective warnings to the defendant of his rights; the accused's knowledge of his right to refuse to consent; absence of any overt act or threat of force against the defendant; absence of any promises to the defendant or any indication of more subtle forms of coercion that might flaw his judgment; the defendant's giving his post-arrest consent on a public street and not in the confines of a police station; the absence of any indication that the defendant was a newcomer to the law, mentally deficient, or unable in the face of custodial arrest to exercise free choice; and the defendant's receiving *Miranda* warnings and notifications that the results of the search could be used against him.

Borne has not argued consent was invalid because of minimal schooling, low intelligence, or other factors listed above. Instead, he argues he was not informed of his rights and did not give any consent. Thus, Borne and Garner directly contradict each other's testimony on consent. For the reasons stated above, I find the testimony of Garner to be credible. Garner's credible testimony

18

is that Borne gave consent, albeit hesitantly, after being informed of his *Miranda* rights. Therefore, I find Borne did knowingly and voluntarily consent to the search of his vehicle.

Even if consent were not given or valid, however, probable cause would support a search of the trunk under the circumstances. Where there is probable cause to believe a vehicle contains contraband, officers may search every part of that vehicle and its contents that may conceal the object of the search. *California v. Acevedo*, 500 U.S. 565, 580 (1991); *United States v. Ross*, 456 U.S. 798, 825 (1982); *United States v. Burns*, 298 F.3d 523, 542 (6th Cir. 2002), *cert. denied*, 538 U.S. 953 (2003). Whether probable cause existed at the time of a warrantless search is a commonsense, practical question that is determined considering the totality of the circumstances. *Id.* Probable cause is to be determined according to the objective facts known to the officers at the time of the search and not according to their subjective intent or to events that occurred after the search. *Id.* By the time Borne's trunk was searched, the stop had developed into more than a simple traffic stop. Even without consent, the troopers had probable cause to search the vehicle, including the trunk, for methamphetamine based upon the totality of the circumstances. *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993) ("we find that Agent Perman's smelling the marijuana [in the truck] then constituted probable cause to believe there was marijuana in the vehicle"); *United States of America v. Atkins*, No. 98-5827, 98-5828,1999 WL 1045942 **2 (6th Cir. Nov. 8, 1999) (strong smell of marijuana coming from car after valid stop for speeding gave officers probable cause to search vehicle for marijuana); *see also United States v. Carrera*, No. 90-6415, 90-6564, 1992 WL 116006, **2 (6th Cir. 1992) ("The smell of marijuana emanating from [the] vehicle gave the officer probable cause to search the vehicle, including the trunk.").

IV. Conclusion

For the reasons stated herein, it is **RECOMMENDED** that Borne's motion to suppress, as supplemented [Doc. Nos. 14, 20] be **DENIED**.[1]

          s/Susan K. Lee
          SUSAN K. LEE
          UNITED STATES MAGISTRATE JUDGE

---

[1] Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7, 106 S. Ct. 466, 472 n.7, 88 L. Ed. 2d 435 (1985). The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).